UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LISA ALTER,

                                   Plaintiff,

           v.

THE ROCKY POINT SCHOOL DISTRICT &
MICHAEL RING,

                                   Defendants.
-------------------------------------------------------------------X

FILED
CLERK

1/12/2017 12:39 pm
For Online Publication Only
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM & ORDER**
13–cv–1100 (JMA) (AKT)

**AZRACK, United States District Judge:**

Plaintiff Lisa Alter is a former employee of defendant Rocky Point School District.  In June 2010, defendant Michael Ring, the incoming superintendent of the Rocky Point School District, made certain inappropriate comments to plaintiff during a meeting.  Alter filed a complaint against Ring and, shortly thereafter, some of plaintiff's job responsibilities were removed.  Less than two months later, plaintiff resigned and informed defendants that she was suffering from depression.

Plaintiff claims (a) that she was subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York Human Rights Law ("NYHRL"); (b) that she was retaliated against for complaining about Ring's comments in violation of Title VII and the NYHRL; (c) that she was discriminated against on the basis of an alleged disability in violation of the Americans with Disabilities Act ("ADA") and the NYHRL; (d) that defendants interfered with her rights under the Family Medical Leave Act ("FMLA"); and (e) that defendants deprived her of her constitutional rights in violation of 42 U.S.C. § 1983.

Both plaintiff and defendants have moved for summary judgment on all of plaintiff's claims.  For the reasons stated below, defendants' motion is granted and plaintiff's motion is denied.

# I. BACKGROUND

## A. Plaintiff's Employment at the Rocky Point School District

Plaintiff Lisa Alter began working at the Rocky Point School District (the "District") on September 1, 1987, when she received a probationary appointment to the position of elementary education teacher.  (Notice of Appointment and Salary, ECF No. 84-1.)  Plaintiff was appointed to the position of elementary school principal in the District in 1994.  (Def's Response to Pl's 56.1 ¶ 16, ECF No. 84.)  Plaintiff took a leave of absence from December 1, 2002, until June 30, 2003, and appears to have used FMLA leave for the first twelve weeks of that leave.  (Letter Dated September 20, 2002, ECF No. 84-2.)  Plaintiff appears to have resigned at the end of that leave of absence and was not employed by the District for approximately a year.

In July 2004, the District rehired plaintiff, placing her in the position of Central Registration Coordinator.  (Notice of Appointment, ECF No. 84-3.)  As the Central Registration Coordinator, plaintiff's primary responsibilities concerned student registration.  (See D'Ambrosio Dep. 23:15–18, Ex. C to Affidavit of Sima Ali dated May 19, 2016 ("Ali Aff."), ECF No. 23-15; see also 2009 Contract ¶ 2(a)(xii), ECF No. 78-7 ("To oversee and coordinate all K–12 Registration.").)  Plaintiff was hired due to a need to "centralize registration at the district office." (D'Ambrosio Aff. ¶ 6, Ex. I Ali Aff., ECF No. 78-5.)

Plaintiff had a very close working relationship with Dr. Carla D'Ambrosio, who was superintendent for the bulk of plaintiff's time working as the Central Registration Coordinator. (Def's Response to Pl's 56.1 ¶ 3; Pl's Response to Def's 56.1 ¶ 12, ECF No. 80.)  Plaintiff reported directly to Dr. D'Ambrosio.  (Pl's Response to Def's 56.1 ¶ 12; see also D'Ambrosio Dep.7:8–13; Alter Dep. 318:20–319:4.[1])

---

[1] Because portions of plaintiff's deposition are scattered under a number of different docket entries, the Court cites only to relevant page and line numbers.  The Court does not refer to the ECF number (or numbers) under which each

From the time of her re-hiring in 2004 until her resignation in August 2010, plaintiff worked in the District on a part-time basis, working approximately three days a week. (Def's Response to Pl's 56.1 ¶¶ 19, 25.) Plaintiff worked on a "flex" schedule that allowed her to alter the days and times that she worked in order to "hav[e] the flexibility for people to be able to register" on the days and times that were convenient for them. (Alter Dep. 162:16–21; 254:16–22.) Plaintiff admits that the ability to take "flex hours" was "not for [her] convenience" but, rather, was intended to allow her to perform her registration duties on a schedule that could change to meet the needs of students. (Id. 252:3-8; see also D'Ambrosio Aff. ¶ 9) (plaintiff's "hours were flexible to accommodate the needs of the community").) Plaintiff's contract made no mention of her ability to work on a flexible schedule. (Alter Dep. 164:12–25.)

In addition to registration responsibilities, plaintiff also had other duties. In an undated "administrator questionnaire" that appears to have been completed by plaintiff in 2009, plaintiff provides a 21-part bulleted list of her job responsibilities. (Administrator Questionnaire. Ex. J to Ali Aff., ECF No. 78-5).) Thirteen of the listed responsibilities concern registration-related responsibilities; the remainder are, as plaintiff described them, "additional responsibilities." (Id.)

Most, if not all, of these "additional responsibilities" appear to have arisen for the first time in 2009 when plaintiff received certain responsibilities in connection with the District's non-instructional personnel. (D'Ambrosio Aff. ¶ 11; see also D'Ambrosio Dep. 23:15–18.) At this time, plaintiff's title became "Administrative Assistant / Central Registration Coordinator," and her work duties were formalized in a contract, apparently for the first time. (2009 Contract, ECF

---

cited portion of the transcript was filed. The portions of plaintiff's deposition transcript referred to in this order are available under ECF numbers 78-1, 82-2, 84-11, 84-12, and 84-13.

No. 78-5.)  This first contract covered July 1, 2009, to June 30, 2010, and was signed by plaintiff on September 21, 2009.  (Id.)

Plaintiff's responsibilities in connection with non-instructional personnel were laid out across a 10-point bulleted list in that contract.  (Id.)  At all times, these duties included, among others, the responsibility to "maintain accurate records regarding employment applications received and responses for non-instructional personnel," "to provide a centralized process for coordinating activities related to the recruitment, selection, retention, and performance evaluation of non-instructional personnel," and "to prepare all reports that relate to personnel data to satisfy District, state, and federal reporting requirements for non-instructional personnel," as well as "to be responsible for issues related to unemployment insurance, workers compensation and the Family Medical Leave Act for non-instructional personnel."  (Id. at ¶¶2(a)(v), (viii), (x), and (xiii).)

Beyond these contractual provisions, the record contains minimal information concerning plaintiff's actual responsibilities in connection with non-instructional personnel.  The only such information concern plaintiff's claims that she had managerial authority over a handful of employees.

For instance, plaintiff testified that she was the "immediate supervisor" of Susan Blake. (Alter Dep. 244:13–17.)  Blake was a receptionist at the District and also handled clerical tasks for a number of employees, including plaintiff.  (Id. at 243:8–23.)  Plaintiff was responsible for evaluating Blake's performance and approving her time off.  (Id. at 233:11–19.)

Plaintiff also testified that Pat Scalone "reported" to her.  Scalone's role is not clear from the record; plaintiff testified that Scalone was "a union president," but also testified that there were "two separate roles she served in the district."  (Id. at 196:4–10; see also Minutes of Aug. 26, 2010 Meeting, Ex. JJ to Ali Aff., ECF No. 78-9) (noting that Scalone was "SRP Union President").)

Plaintiff's testimony also indicates, however, that plaintiff had no responsibility for Scalone, did not evaluate her, and did not approve of Scalone's request for time off.  (Alter Dep. 196:5–10.) Indeed, plaintiff even testified that Scalone was not "a direct report."  (Id. at 196:2–4.)  Thus, the scope of plaintiff's responsibility over Scalone is unclear.

In addition to her responsibilities for non-instructional personnel, plaintiff also appears to have been responsible for overseeing and approving aspects of the District's "community education" program, which was a "continuing adult education" program.  (Id. at 211:13–15; see also Administrator Questionnaire.)  Plaintiff's contract does not list this responsibility, but plaintiff testified that she was responsible for "[a]pproving the courses that were being offered" by the Community Education department, "making recommendations to the board on the teachers for the classes, signing the payroll to all of them, [and] approving the requisitions."  (Alter Dep. 219:2–7.)  Although plaintiff testified that she was the "highest-level person to approve courses that were going to be offered through" the Community Education program, she also admitted that she acted as "the intermediary" between employees working in the program and the superintendent.  (Id. at 219:14–17; 220:18–24.)

In particular, plaintiff testified that an employee named Veronica Gilbert would recommend teachers to be hired for Community Education courses and then plaintiff would review those requests and send her own recommendations to the superintendent via email.  (Id. at 219:20–24.)  Gilbert would also bring any supply requisition requests from the Community Education program to plaintiff for approval.  (Id. at 211:5–20.)  Plaintiff estimates that she approved such requests approximately one time each semester.  (Id. at 211:9–212:7.)  It is unclear to what extent, if at all, plaintiff had the discretion or authority to deny or modify the requisition requests presented to her.

**B.  Defendant Ring's Appointment As Superintendent**

At some point in 2008 or 2009, Dr. D'Ambrosio announced that she planned to retire when her contract expired on June 30, 2010.  (D'Ambrosio Aff. ¶ 5.)  In anticipation of Dr. D'Ambrosio's retirement, the Rocky Point School Board began a search for a replacement superintendent in the fall of 2009.  (Nofi Dep. 11:8–12, ECF No. 82-6.)  In approximately April 2010, Dr. Michael Ring—then Assistant Superintendent of Finance and Operations—was notified that he had been selected to replace Dr. D'Ambrosio.  (Ring Dep. 6:13–14; 7:7–11, ECF No. 82-3.)

After Dr. Ring's appointment was formally announced, he had a meeting with Dr. D'Ambrosio in which they briefly discussed the transition.  (D'Ambrosio Dep. 49:2–24.)  During this meeting, Dr. Ring said that, although the District might need "to cut back on staff and personnel" as a result of the "2008 recession," he was certain that he wanted to keep plaintiff in his administration because she had valuable skills and expertise.  (Id. at 49:3–10; Ring Dep. 165:18–21.)

Dr. Ring planned to—and, ultimately, did—implement some degree of organizational re-structuring when he began his term as superintendent.  (See, e.g., Pl's Response to Def's 56.1 ¶ 13.)  Among the changes that occurred were the promotion of Susan Wilson to the position of Executive Director for Educational Services.  (Ring Dep. 51:8–51:25; Alter Dep. 145:19–146:9.)  Under Ring's new organizational structure, plaintiff would largely maintain her duties but would report to Wilson, rather than directly to the superintendent.  (Alter Dep. 154:4–10.)  Dr. Ring's changes also included the hiring of Deborah DeLuca as assistant superintendent; DeLuca was a new hire to the District.  (Ring Dep. 49:17–50:7.)

**C.  Conversation Between Plaintiff and Defendant Ring on June 2, 2010**

On June, 2, 2010—prior to the beginning of Dr. Ring's term as superintendent, but after his appointment and certain organizational changes had been announced—plaintiff visited Dr. Ring's office to discuss a personnel issue concerning a non-instructional employee.  (See Pl's Response to Def's 56.1 ¶ 22.)  Also present in the office was Greg Hilton, the Business Manager for the District.  (See id.)  In all, the conversation between Dr. Ring, Hilton, and plaintiff lasted approximately an hour.  (Alter Dep. 51:2–4.)  Plaintiff described much of the conversation as "small talk."  (Id. at 60:15.)

At some point during the conversation, plaintiff asked Dr. Ring a number of questions about DeLuca, the incoming Assistant Superintendent.  The questions she asked included "what [Dr. Ring] thought of Deb DeLuca, if he thought she was nice," and "if [plaintiff] would get along with her."  (Id. at 50:16–25.)  She also asked "is she married, how many kids does she have" and "what color hair does she have."  (Id. at 51:2–15.)  Plaintiff testified that she was not certain of the precise order in which she asked these questions and indicated that the questions "weren't just rattled off.  They were within the hour-long conversation.  Different things took place between those questions."  (Id. at 52:10–13.)

In response to plaintiff's question about DeLuca's hair color, Dr. Ring responded that "he didn't know whether she was a natural blond based on the pelvic examination."  (Id. at 65:11–13.)  In response to plaintiff's question about whether DeLuca was married, Dr. Ring responded that he "couldn't tell how much traffic was down there based on [his] pelvic exam."  (Id. at 65:2–4.)  Dr. Ring also made a third comment in which he remarked that plaintiff's questions were "not typical interview questions" and that he was "unable to determine that [information] from my pelvic exam,"

at which time he "put his hands up in the air . . . as if he had on the medical gloves."  (Id. at 65:15–22.)

In response to Dr. Ring's first "pelvic exam" comment, plaintiff replied "that comment wasn't necessary and I was just trying to find out more information about" DeLuca.  (Id. at 66:14–17.)  After Dr. Ring made the second "pelvic exam" comment in response to plaintiff's questions about DeLuca's marital status, plaintiff "was numb" and appears not to have directly responded to the second or third comments.  (Id. at 66:24.)

Throughout the hour-long meeting, several other topics were discussed.  These topics included plaintiff's contract for the 2010-2011 year, as well as a discussion of a "PTA president in the school district that [Dr. Ring's] daughter goes to."  (Id. at 52:21–25; 53:8–10.)  The exact content of the comments about the PTA president are disputed.  According to plaintiff, the PTA president "was thought to have slept with the Principal" and, after finding out that "Hilton's wife was current PTA President, Dr. Ring asked Mr. Hilton if his wife is sleeping with the Principal." (Alter Aff. ¶ 8, Ex. L to Ali Aff., ECF No. 78-5.)  At one point, Dr. Ring made another sex-related comment, using the phrase "man on man like on Fire Island"—apparently a reference to homosexuality.  (Id. at ¶ 9.)  The precise content and context of this comment are unclear.

The end of this conversation was "nothing remarkable" and, after the meeting, plaintiff left the office because it was her "regular time to leave."  (Alter Dep. 78:5–24.)

**D.  Board Investigation**

After the conversation with Dr. Ring, plaintiff called Anja Groth—the Title IX officer at the District—to tell her about the conversation.  (Id. at 80:4–81:5.)  Plaintiff testified that she called Groth both as a personal friend and in her capacity as Title IX officer.  (Id. at 81:6–14.)  Plaintiff

did not ask Groth to take any action.  (<u>Id.</u> at 81:15-18.)  The following day, plaintiff spoke with Dr. D'Ambrosio about the incident.  (<u>Id.</u> at 85:2–25.)

After speaking with plaintiff and reviewing the District's sexual harassment policy, Dr. D'Ambrosio determined that the appropriate next step would be a formal investigation and, thereafter, contacted Michael Nofi, President of the Board of Education.  (D'Ambrosio Dep. 66:9–21; 69:23–24; 71:22–72:3.)  Dr. D'Ambrosio organized a meeting between herself, Nofi, plaintiff, and Diane Burke, the Vice-President of the Board of Education.  (<u>Id.</u> at 71:22–72:3; Pl's Response to Def's 56.1 ¶ 39.)  At the meeting, Nofi expressed that he was "appalled" by Ring's comments and told plaintiff that "he was gonna reach out to Mike Ring and discuss this with him."  (Alter Dep. 96:12–20.)

On June 7, 2010, Dr. D'Ambrosio sent a memorandum to the Board of Education indicating that she had recommended to Nofi that the Board conduct an investigation of Dr. Ring's comments "that is prompt, thorough, and compliant with the law."  (D'Amrosio Mem., Ex. P to Ali. Aff., ECF No. 78-6.)  Dr. D'Ambrosio also recommended engaging "special independent counsel" to conduct the investigation rather than using the school's general counsel, David Pearl, an attorney with the firm of Hamburger, Maxson, Yaffe, Knauer and McNally, LLP.  (<u>Id.</u>; Pearl Dep. 4:23–25, ECF No. 82–8; <u>see also</u> Pl's Response to Def's 56.1 ¶ 43.)  Dr. D'Ambrosio was concerned that Pearl presented a "conflict of interest or perception of impropriety" due to a personal relationship between Dr. Ring and a partner at Pearl's firm.  (D'Ambrosio Mem.)  Specifically, during the June 2 conversation with plaintiff, Dr. Ring had "casually stated he was at a Communion for Mr. Lane Maxson's son, who is a partner in the law firm that employs Mr. Pearl."  (<u>Id.</u>)

Despite Dr. D'Ambrosio's concerns, the District Board of Education ultimately asked Pearl to conduct an investigation of plaintiff's complaint.  (Nofi Dep. 49:15–18.)  As part of his

investigation, Pearl first interviewed plaintiff in order to determine "all possible witnesses to the event." (Pearl Dep. 112:8–16.)  Pearl then went on to interview Dr. Ring, Hilton, Dr. D'Ambrosio, and Dr. Ring's Secretary.  (Id. at 112:17–114:3; Pearl Report, Ex. Q to Ali Aff., ECF No. 78-6.)  Pearl produced a report dated June 24, 2010, summarizing the results of his interviews and concluding that this "single conversation" does not "rise[] to the legal standard required to establish hostile environment sexual harassment," but recommending that the "Board of Education consider providing Dr. Ring a letter informing him that the Board deems his remarks inappropriate and unnecessary" and "urg[ing]" him to "apologize to [plaintiff] as soon as possible."  (Pearl Report at 13–14.)  At some point between June 24 and June 30, Pearl presented his report to the Rocky Point Board of Education, which accepted his findings.

On June 30, 2010, Pearl presented his findings to plaintiff in her office.  (Alter. Dep. 121:9–16; Alter Notes from June 30 Meeting, Ex. S to Ali Aff., ECF No. 78–7.)  Plaintiff testified that Pearl:

> told me that it was his determination that based on the law it didn't classify as sexual harassment.  There was no hostile working environment and that the board already adopted his report on June 28, that Mike Ring was going to be urged to apologize, that the comments were inappropriate and unnecessary.

(Alter. Dep. 121:19–122:5.)  Plaintiff inquired whether Pearl had interviewed additional employees "to establish any kind of pattern to this behavior" and Pearl responded that he had not, adding that he "wasn't on a witch hunt."  (Id. at 122:17–23; see also Pearl Dep. 174:4–15.)  When plaintiff asked if she "had any recourse" to appeal Pearl's determination, Pearl responded that she did not "have any recourse other than litigation."  (Alter. Dep. 122:9–12.)

Plaintiff testified that, "[b]ased on what David Pearl had told [her, she] felt comfortable that the investigation was done, didn't qualify as sexual harassment and that Mike Ring was going to apologize for his comments."  (Id. at 132:22–133:3.)  Dr. Ring apologized to plaintiff in a

telephone call the following day; plaintiff accepted his apology and said she was happy to move on. (Id. at 133:12–25; Pearl Letter to File Dated July 2, 2010, ECF No. 78–7).)

**E. Plaintiff's New Contract**

At the same June 30 meeting where Pearl presented his findings to plaintiff, Pearl also provided her with a copy of her contract for the year starting July 1, 2010. (Alter Dep. 133:3–5; see 2010 Contract, ECF No. 78-7.) Plaintiff had the opportunity to "quickly" review the six-page contract "once or twice" and appears to have been satisfied, at the time, that she had been allowed an adequate opportunity to review the contract. (Alter Dep. 141:18–19; 157:2–6.) The following day, when she was home from work with a sick child, plaintiff had a telephone call with Dr. Ring and Pearl to discuss the new contract. (Id. at 139:11–24.) At some point during the conversation, plaintiff asked for, and received, a 2% raise. (Id. at 142:3–11.) This raise, which boosted plaintiff's salary to $63,240, was ultimately reflected in the final contract on July 1. (Compare 2009 Contract ¶ 4 with 2010 Contract ¶ 5.)

A number of responsibilities that had been included in plaintiff's 2009 contract were absent from her 2010 contract, and a handful of other alterations were made. No new responsibilities appear to have been added. The most substantial differences between the 2009 and 2010 contracts are detailed below:

- The following responsibilities were present in the 2009 contract but absent from the 2010 contract:
  - "To participate in contract negotiations with the District's non-instructional bargaining units" (2009 Contract ¶ 2(a)(xi)));
  - "To help achieve district mission and related goals;" (Id. ¶ 2(a)(xv));
  - "To act as coordinator of homebound special education instruction" (Id. ¶ 2(a)(xvii);
  - "To act as coordinator for home schooled students" (Id. ¶ 2(a)(xvii)); and
  - "To oversee the Universal Pre-Kindergarten program" (Id. ¶ 2(a)(xix).)

11

- Where the 2009 contract noted that plaintiff was "[t]o formulate and administer" various policies concerning non-instructional personnel, the 2010 contract noted that she was "[t]o assist with the formulation and administration" of those policies. (<u>Compare</u> 2009 Contract ¶ 2(a)(iv) <u>with</u> 2010 Contract ¶ 2(a)(iv).)

- Where the 2009 contract noted that plaintiff was to "screen, interview, and select . . . non-instructional staff" and to "make recommendations to the Superintendent" about the same, the 2010 contract eliminated her responsibility for "select[ing]" staff. The remainder of these responsibilities remained the same, except that the 2010 Contract now noted that these tasks are to be performed in conjunction with the Executive Director for Educational Services rather than the superintendent. (<u>Compare</u> 2009 Contract ¶¶ 2(a)(vi)-(vii) <u>with</u> 2010 Contract ¶ 2(a)(vi).)

- Certain provisions indicating that plaintiff was to take direction "from the Superintendent" were altered to indicate that she was to take direction "from the Superintendent or his designee." (<u>Compare</u> 2009 Contract ¶ 2(a)(xx) <u>with</u> 2010 Contract ¶ 2(a)(xiv).)

Beyond these changes and a handful of structural changes that do not materially alter the contract, the 2010 contract is identical to the 2009 contract. In particular, plaintiff's primary responsibility to "oversee and coordinate all K-12 registration" remained unchanged, as did most of plaintiff's responsibilities in connection with non-instructional personnel. (<u>See</u> 2010 Contract ¶¶ 2(a)(xiv).) Like the 2009 contract, the 2010 contract contains no mention of any responsibility for the Community Education program or plaintiff's ability to take "flex" hours.

There is some dispute as to the granularity with which plaintiff, Pearl, and Dr. Ring discussed the changes to her contract during their conversation on July 1, 2010. Plaintiff concedes, however, that she was aware that "there was a reorganization going on in the district office" at the time. (Alter Dep. 150:20–25.) Plaintiff also concedes that she, Dr. Ring, and Pearl discussed that, as a result of the district reorganization, her reporting structure changed and she would report to Susan Wilson, rather than directly to the superintendent. (<u>Id.</u> at 154:4-10.)

At his deposition, Dr. Ring provided some explanations for the responsibilities that were removed from plaintiff's contract. First, with respect to the responsibility to "participate in

contract negotiations with the District's non-instructional bargaining units," Dr. Ring testified that plaintiff "had never participated in negotiations with that bargaining unit because no bargaining went on during . . . the one year that" plaintiff was in that role. (Ring Dep. 173:8–20.) Dr. Ring testified that it was his "belief that going forward [that he] as Superintendent with Counsel would do the negotiations with all bargaining units." (Id.) Second, Dr. Ring testified that the responsibility to "help achieve the District's mission and related goals" was removed because "it seemed extraneous." (Ring Dep. 173:21–25.) Third, Dr. Ring testified that the responsibilities over home schooled students were removed because that was a duty that was "done by others" and "there would be no reason for that in her contract." (Ring Dep. 170:16–171:11.) Finally, Dr. Ring testified that the responsibility for "overseeing the Universal Pre-Kindergarten program" was removed because that duty had been administered by another person and, "while the [2009] contract may have said" that plaintiff was responsible for that role, "the reality was that this other individual was performing that role." (Ring Dep. 171:12–24.)[2]

## F.  Plaintiff's Employment Under the New Contract

After signing her contract on July 1, 2010, plaintiff went on vacation and did not return to work until the week of July 12. (Alter Dep. 162:7–12.) After she returned from vacation, plaintiff testified that she was surprised by certain additional changes to her role and responsibilities. (See id. at 194:8–214:10.) Each of these changes is explained below. Some of these changes were apparently discussed at a "reorg meeting" that occurred while plaintiff was on vacation. (See id. at 195:6–14; 214:11–16; see also D'Ambrosio Aff. ¶ 15.)

First, plaintiff lost some of her responsibilities over non-instructional personnel. In an email dated August 4, 2010, Wilson indicated that she—rather than plaintiff—was to receive "all

---

[2] Plaintiff offers no evidence contradicting Dr. Ring's assertions concerning the duties removed from her contract.

requests" concerning "non-instructional employment," but also notes that Wilson "will work with [plaintiff] to review the information as it arrives." (Aug. 4, 2010 email, Ex.Z to Ali Aff., ECF No. 78-7.) Plaintiff retained some level of involvement in this process; for instance, Wilson emailed plaintiff on July 27, 2010, stating that she had "a personnel issue [she] would like to discuss." (July 27, 2010 Email, Ex. BB to Ali Aff., ECF No. 78-8.) Thus, the extent to which such duties were transitioned away from plaintiff remains unclear.

Second, certain employees who previously reported to plaintiff no longer did so. In an August 2, 2010 email from Blake to plaintiff, Blake states: "During the third week of July, I asked Susan Wilson if I still report to Lisa Alter because it was never made clear to me who I now report to" and that Wilson told Blake that she was "to directly report to her and that Lisa [reports to Wilson] as well." (Aug. 3, 2010 email, Ex. X to Ali Aff, ECF No. 78-7).) Although plaintiff was no longer Blake's "immediate supervisor," Blake still handled all of the same clerical tasks for plaintiff. (Alter Dep. 244:10–12.)

Plaintiff also testified that Pat Scalone no longer reported to her and that Scalone "needed to go to" Wilson instead. (Alter Dep. 195:6–17.) On July 19, plaintiff emailed Wilson stating: "I just got off the phone with Pat Scalone. She told me she discussed the MD situation with you so we will not need to meet. Is this correct?" (July 19, 2010 email, Ex. Y to Ali Aff., ECF No. 78-7).) Wilson responded in the affirmative. (Id.) Beyond this, there is nothing in the record concerning any changes to plaintiff's managerial authority over Scalone.

Third, plaintiff lost some of her responsibilities over the Community Education program. Gilbert told plaintiff that Gilbert was "not reporting to [plaintiff] anymore" and that she was "reporting to Susan Wilson" instead. (Alter Aff. 218:4–6.) When Gilbert relayed this information to plaintiff, Gilbert asked plaintiff, "what did you do to piss them off?" (Id.) Plaintiff also learned

that she was no longer able to "approve requisitions;" this responsibility was transferred to Susan Wilson.  (Id. at 211:5–214:10.)

In addition to the diminution in her duties, plaintiff testified to a number of miscellaneous changes to her work environment.  For instance, in July 2010, Wilson told her that Dr. Ring "no longer wanted [her] to have flex hours" and that he "needed to know specifically what three days of the week [she] was going to work and what those hours were going to be" during the school year.  (Id. at 249:25-250:5.)  Plaintiff conceded that this change would not have any impact on her salary, personal leave, or ability to take time off for family obligations.  (Id. at 254:2-10.)

Plaintiff also complained that Wilson had asked her to coordinate with Gilbert to ensure that the participants of a summer camp on school grounds did "not leave their garbage on the fields" after camp ended.  (Aug. 10, 2010 email, Ex. CC to Ali Aff., ECF No. 78-8).)  According to plaintiff, the fact that she was asked to handle this task was "another way that [Dr. Ring] could have me do something that was diminishing my role."  (Alter Dep. at 269:3–6.)  Plaintiff explained that this "diminished" her role because, although Gilbert no longer reported to her in connection with the Community Education program, she was told to coordinate with Gilbert on "garbage" issues.  (Id. at 269:3–19.)

Plaintiff also testified that she felt that Dr. Ring attempted to isolate her.  In support of this, plaintiff testified that her interaction with Dr. Ring after July 1 was limited to "passing in the hall." (Id. at 247:15–19.)  Plaintiff was also left off of an email chain scheduling the first "cabinet" meeting of Dr. Ring's new administration; plaintiff testified that she had no knowledge as to why she was left off the original email chain, and the record includes no information establishing whether or not the omission was intentional.  (Aug. 9, 2010 Email, Ex. DD to Ali Aff., ECF No. 78-8; Alter Dep. 263:21–25.)  Although Wilson notified plaintiff of the meeting the night before

it was to occur, plaintiff was unable to attend because she had already scheduled registrations for that time.  (Aug. 9, 2010 Email; Alter Dep. 262:15–18.)  Finally, plaintiff testified that Wilson did not tell her, in advance, of a scheduled a meeting that concerned a custodian that plaintiff "was involved in."  (Alter Dep. 274:16–275:4.)  Plaintiff, however, was informed of the meeting shortly before it occurred and did, in fact, attend the meeting.  (Id.)

The record also contains an email exchange between plaintiff and Wilson concerning a reporter who contacted plaintiff with questions about the District.  (July 27, 2010 Email.)  Wilson responded that she "ha[s] taken care of this," indicating that she spoke to the reporter without involving plaintiff.  (Id.)  Plaintiff apparently includes this email in support of a claim that corresponding with reporters was formerly her responsibility, although the record includes no evidence that she had ever had such a responsibility before.

## G.  Plaintiff's Absences in July and August 2010

Between July 1 and August 26, 2010, plaintiff was absent for approximately 13 days.  (Attendance Record, Ex. GG to Ali Aff., ECF No. 78-8).  Plaintiff took eight vacation days and four-and-a-half sick days.  (Id.)  Since plaintiff works only three days a week, this means that she worked for approximately 11 days after July 1, 2010.  All of those days occurred during the summer, when school was not in session.

## H.  Plaintiff's Resignation

On August 26, 2010, plaintiff visited Wilson in her office and asked to speak with her privately.  (Minutes of Aug. 26, 2010 Meeting.)  Plaintiff told Wilson that she was resigning and gave her two identical copies of her resignation letter: one for Wilson, and one intended for Dr. Ring.  (Id., see also Aug. 25, 2010 Resignation Ltr., Ex. II to Ali Aff., ECF No. 78-9.)  According to Wilson's account of the meeting, plaintiff "had no intention of returning to work after today;

her resignation was immediate." (Minutes of Aug. 26, 2010 Meeting.) Indeed, plaintiff had told the "secretaries in the personnel office . . . that she was resigning prior to telling" Wilson. (Id.)

Plaintiff told Wilson that she was resigning because she felt that "she had been stripped of many of her duties since July 1, 2010, when Dr. Ring assumed the role of Superintendent." (Id.) Plaintiff said that Wilson "was a pawn being used by Dr. Ring to remove all her job responsibilities one by one." (Id.) By way of example, plaintiff told Wilson that she was "embarrassed and humiliated" when she discovered "that she could no longer approve requisitions" for the Community Education program. (Id.) She also explained that she was upset that Scalone "would have to speak with [Wilson] instead of" her in the future. (Id.) At the end of the meeting, Plaintiff told Wilson that she would leave the building immediately and asked Wilson to wait a few minutes before giving her letter of resignation to Dr. Ring because she "wanted to be certain that she was not in the building." (Id.) On September 1, 2010, the Board of Education sent a letter to plaintiff indicating that it had accepted her resignation at its meeting on August 30, 2010. (Sept. 1, 2010 Ltr., Ex. KK to Ali Aff., ECF No. 78-9.)

Plaintiff's letter of resignation claimed that she suffered from depression. (Aug. 25, 2010 Resignation Ltr.) This is the first time that defendants received any notice that plaintiff claimed to suffer from depression.[3]

On March 1, 2013, plaintiff initiated this lawsuit by filing a complaint naming Dr. Ring and the District as defendants.

---

[3] Nothing in the record indicates that the sick days that plaintiff took over the summer were due to plaintiff's alleged depression. (See Alter Dep. 139:11–19, 169:4–25, 170:2–5.) More importantly, nothing in the record suggests that any information relayed to defendants concerning these sick days would have alerted them about plaintiff's alleged depression.

# II. DISCUSSION

## A.  Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]"[4] Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).  To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts."  Id. at 586 (citations omitted).  Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment.  See Shannon v. New

---

[4]  As explained below, the Court is granting defendants' motion.  Accordingly, the Court has analyzed all of the evidence in the light most favorable to plaintiff.

York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).  Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate.  Anderson, 477 U.S. at 249.

In an employment discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  Id.  The Second Circuit has recognized, however, that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).  Thus, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'"  Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

## B.  Hostile Work Environment Claim Based on Dr. Ring's Sexual Comments

Plaintiff's First and Third Causes of Action are for hostile work environment under Title VII and under the NYHRL, respectively.   "The elements of a hostile work environment claim under NYHRL are identical to the elements required under the equivalent federal antidiscrimination laws."  Illiano v. Mineola Union Free Sch. Dist., 585 F. Supp. 2d 341, 349 (E.D.N.Y. 2008) (citing Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006)); see also Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714–15 (2d Cir. 1996).  As such, the Court analyzes plaintiff's hostile work environment claims together.

**1. Standard**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The NYHRL contains functionally identical language. See NY Exec. L. § 296(a). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . Title VII is violated." Id. at 21 (quoting Meritor Savings Bank, FSB, 477 U.S. at 65, 67).

In order to prove the existence of a hostile work environment, a plaintiff must demonstrate that "the misconduct shown [is] severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim . . . subjectively perceive[d] that environment to be abusive." Feingold v. N.Y., 366 F.3d 138, 150 (2d Cir. 2004) (internal quotations omitted); see also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

Under the objective prong of this inquiry, the existence (or non-existence) of a hostile work environment must be "measured by the totality of the circumstances." Chandler v. AMR Am. Eagle Airline, 251 F. Supp. 2d 1173, 1185 (E.D.N.Y. 2003) (citing Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999)). Among the factors that courts consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." Feingold, 366 F.3d at 150 (quoting Harris, 510 U.S. at 23).

Generally, in order to qualify as a hostile work environment, "incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Id., 366 F.3d at 150 (quoting Alfano, 294 F.3d at 374). Courts have recognized, however, that "there is 'no fixed number of incidents that a plaintiff need endure to establish a hostile work environment claim.'" Chandler, 251 F. Supp. 2d at 1185 (quoting Alfano, 294 F.3d at 379). Indeed, even "a single act can create a hostile work environment if it in fact 'work[s] a transformation of the plaintiff's workplace.'" Feingold, 366 F.3d at 150 (quoting Alfano, 294 F.3d at 374). But, "a single isolated instance of harassment is insufficient to establish a hostile work environment claim unless it [is] 'extraordinarily severe.'" Hawkins v. City of N.Y., No. 99-cv-11704, 2005 WL 1861855, at *15 (S.D.N.Y. Aug. 4, 2005).

## 2. Plaintiff Has Not Demonstrated a Hostile Work Environment

The record is insufficient to support a finding that plaintiff was subjected to a hostile work environment. Indeed, the record indicates that the complained-of conduct occurred during a single, hour-long meeting between plaintiff, Dr. Ring, and Hilton. When viewed in the light most favorable to plaintiff, the record indicates that Dr. Ring made three off-color comments concerning a "pelvic exam" in response to plaintiff's personal questions about an incoming assistant superintendent. The record also indicates that Dr. Ring made a sexual comment concerning a school principal and, possibly Hilton's wife, as well as a comment making reference to homosexuality. There is no indication that plaintiff was ever subjected to similar comments either before or after the meeting.

Even in the light most favorable to plaintiff, Dr. Ring's conduct, while inappropriate, was

not sufficient to "alter the conditions of [plaintiff's] employment and create an abusive working environment," as is required to violate Title VII. Harris, 510 U.S. at 21 (1993) (internal quotations omitted).

As an initial matter, the record is clear that the conduct complained of was not pervasive. Indeed, it is undisputed that plaintiff was subject to comments of a sexual nature on only a single occasion. This is far from the type of "continuous and concerted" conduct that might qualify as pervasive so as to support a finding of a hostile work environment. Feingold, 366 F.3d at 150 (quoting Alfano, 294 F.3d at 374).

Because the conduct complained of here occurred only in an isolated incident, in must be extraordinarily severe in order to support a hostile work environment claim. It falls far short of this standard and is entirely dissimilar from the types of conduct that courts find sufficient, even in isolation, to create a hostile work environment. For instance, another court in this district recently found that a single incident involving a prominently displayed noose was sufficiently severe so as to present a triable issue of fact as to whether African-American plaintiffs were subject to a hostile work environment, based on a recognition that "the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence." Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 452 (E.D.N.Y. 2011) (quoting Williams v. N.Y. City Housing Auth., 154 F. Supp. 2d 820, 824 (S.D.N.Y.2001)). On the other hand, a single incident in which a supervisor told a plaintiff that "she had been voted the 'sleekest ass' in the office," and his "deliberat[e] touch[ing of her] breasts with some papers that he was holding in his hand"—conduct that is far more extreme than that at issue here—was insufficient to support a hostile work environment claim. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998); see also Pagan v. N.Y. State Div. of Parole, No. 98-cv-5840, 2003 WL

22723013 (S.D.N.Y. Nov. 18, 2003) (finding that "four specific instances when [a supervisor] made derogatory remarks concerning Puerto Ricans or Hispanics in [plaintiff's] presence" was insufficient); Upshur v. Dam, No. 00-cv-2061, 2003 WL 135819, at *7–*8 (S.D.N.Y. Jan. 17, 2003) (finding that one week of "patronizing and racist comments" by supervisor was insufficient).

While Dr. Ring's comments may have been offensive to plaintiff, they fall well short of an objectively hostile work environment. Dr. Ring's comments are just the type of "vulgar banter, tinged with sexual innuendo" that the Second Circuit has found to be insufficient. Redd v. N.Y. Div. of Parole, 678 F.3d 166, 177 (2d Cir. 2012) (internal quotations omitted). No reasonable jury could find that Dr. Ring's conduct was "sufficiently severe or pervasive to alter the condition of [plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 21 (quoting Meritor 477 U.S. at 65, 67).

For these reasons, defendants' motion for summary judgment on plaintiff's hostile work environment claims is granted, and plaintiff's motion for summary judgment on those claims is denied.

## C. **Retaliation Claim**

Plaintiff's Second and Fourth Causes of Action are for retaliation under Title VII and under the NYHRL, respectively. Retaliation claims under these statutes are subject to identical analyses. Van Zant, 80 F.3d at 715–16. Plaintiff appears to argue that defendants retaliated against her both by effecting materially adverse changes to her work environment and by constructively discharging her.

Claims for retaliation are "analyzed under a modified version of the McDonnell Douglas test." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011) (citing Hicks v. Baines, 593 F.3d 159, 164–65 (2d Cir. 2010)); see also McDonnell Douglas Corp. v.

<u>Green</u>, 411 U.S. 792, 802–05 (1973).  Under that test, plaintiff bears the initial burden of establishing "a prima facie case of retaliation by showing: (1) his participation in protected activity; (2) defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>Tepperwien</u>, 663 F.3d at 568 n.6.

If plaintiff states a prima facie case, "the burden shifts to defendants to state a legitimate non-discriminatory reason" for the allegedly retaliatory action.  <u>Feingold</u>, 366 F.3d at 157.  That is, the employer must "articulate a legitimate, non-discriminatory reason for its adverse employment action."  <u>Tepperwien</u>, 663 F.3d at 568 n.6.  If the defendant is able to articulate a non-discriminatory reason, "the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action" and that the proffered reason was a mere pretext.  <u>Id.</u>

Because plaintiff has failed to demonstrate that defendants took any materially adverse action against her or that she was constructively discharged, she has failed to make out a prima facie case of retaliation.  The Court therefore does not reach any subsequent issues.

## 1. Standard for Material Adversity

Plaintiff bears the burden of demonstrating that defendants took an action that "a reasonable employee would have found [to be] materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006) (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  The Supreme Court has specifically held that a materially adverse action need not be "related to employment or occur at the workplace" because the "scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  <u>Burlington N. & Santa Fe Ry. Co.</u> 548 U.S. at 67.

Thus, the inquiry is whether the "employer's challenged action would have been material to a reasonable employee," which may be so "regardless whether the alleged retaliatory act is related to the plaintiff's employment." Rochon, 438 F.3d at 1219 (internal quotations omitted).

When considering whether the alleged acts of retaliation rise to the level of material adversity, a court must consider the actions "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." Hicks, 593 F.3d at 165. In order to be materially adverse, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. On the other hand, actions "that are 'trivial harms'—i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." Tepperwien, 663 F.3d at 568 (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68).

### 2. Plaintiff has Failed to Establish Any Materially Adverse Action

Plaintiff argues that the changes in her work environment after July 1 constituted a materially adverse action. These complained-of changes consist of a handful of diminished job responsibilities and other miscellaneous changes. The record is such that no reasonable jury could find the claimed changes to be materially adverse. As explained below, a number of plaintiff's allegations concerning her allegedly diminished responsibilities are completely unsupported by the record. Plaintiff's other allegations are addressed in turn.

Although plaintiff argues that her job was "substantially changed" under her 2010

employment contract and lists nine specific responsibilities that were allegedly "removed from her contract," many of the listed responsibilities cited by plaintiff were never in plaintiff's earlier contract. (Pl. Opp. at 17.) The Court therefore assumes that plaintiff intends to argue that she lost the listed job responsibilities, regardless of whether those responsibilities ever appeared in any contract.

### a. Allegations of Diminished Responsibilities that are Unsupported

As an initial matter, some of plaintiff's claims of "removed" responsibilities are utterly unsupported by the record. For example, although plaintiff argues that her "duties as Homeless Liaison" were removed, plaintiff's 2010 contract explicitly states that plaintiff is to "act as the District's homeless liaison." (Pl. Opp. at 17; 2010 Contract ¶¶ 2(a)(xiii).) Although the record details of these duties is unclear, there is no indication that any such duties were removed.

Next, plaintiff argues that her role as Coordinator of Central Registration was reduced. (Pl. Opp. at 17.) Plaintiff's 2010 contract, however, includes precisely the same language as her 2009 contract to describe this role, noting that plaintiff is "[t]o oversee and coordinate all K-12 registration." (2009 Contract ¶¶ 2(a)(iv); 2010 Contract ¶¶ 2(a)(xii).) Further, the record contains no indication that plaintiff's duties concerning the registration of duties were ever diminished, and this appears to have been her primary duty at all times.

Plaintiff also argues that her "PR communications role" was removed. (Pl. Opp. at 17.) Neither of plaintiff's contracts make any mention of a "PR communications role," and the only mention of such a role in the record is in plaintiff's EEOC charge, which describes an incident in which a journalist contacted plaintiff, after which Wilson responded to the journalist directly. (EEOC Charge ¶ 50, Ex. MM to Ali Aff., ECF No. 78-9; July 27, 2010 email.) There is no indication that plaintiff had ever previously been responsible for communicating with journalists

26

or that she had any "PR Communications role."

Plaintiff also claims that her "previous role of HR Manager for non-instructional personnel" was "minimiz[ed]" and that she no longer had the "responsibility of hiring non-instructional personnel." (Pl. Opp. at 17.) The Court notes that plaintiff's 2010 contract contains many responsibilities relating to non-instructional personnel. To the extent that these allegations are intended to be distinct from plaintiff's claims concerning the removal of her "direct reports," her exclusion from meetings, and the alterations with respect to her responsibilities over the Community Education program—all of which are discussed below—there is no support for this allegation in the record.

> b. *Allegations of Diminished Responsibilities With Some Support in the Record*

Some of plaintiff's allegations are supported by evidence in the record. Specifically, plaintiff alleges:

- That Blake, Gilbert, and Scalone no longer reported to plaintiff.[5]
- That plaintiff lost responsibilities concerning the Community Education program, including her ability to approve requisition requests.
- That plaintiff received belated notice about two meetings, one of which—the "cabinet" meeting—she was ultimately unable to attend because of the late notice.
- That five responsibilities included in her 2009 contract were absent from her 2010 contract.[6]

When all of the above points concerning plaintiff's diminished job responsibilities are viewed in their totality, however, no reasonable jury could conclude that plaintiff was subjected to a materially adverse action. Plaintiff's primary responsibilities—overseeing and coordinating student registration—were not changed or reduced at all. Although plaintiff lost certain

---

[5] As explained earlier, the extent to which Scalone "reported" to plaintiff is not clear.

[6] As noted above, Dr. Ring explained that these responsibilities were removed from plaintiff's contract either because they were redundant or were duties that, in reality, were performed by employees other than plaintiff. Plaintiff does not appear to dispute Dr. Ring's assertions, and plaintiff's briefs do not rely on these removed duties in support of her argument that she was subjected to "material adverse changes." (See Pl's Opp. at 17.) Nevertheless, the Court has considered all changes to plaintiff's contract.

responsibilities, those responsibilities were relatively minor and unrelated to her core duties.  And, plaintiff did not lose *any* benefits; her title stayed the same, she retained all of the clerical support she previously received, and she even received a raise.   The changes to plaintiff's job responsibilities after July 1, 2010, amount to "a mere inconvenience or an alteration of job responsibilities" and, thus, are not significantly disruptive to rise to the level of material adversity. Galabya, 202 F.3d at 640.

### c.    Other Miscellaneous Allegations

Plaintiff also raises a handful of miscellaneous allegations in support of her argument that defendants retaliated against her.

First, plaintiff claims that defendants had violated School Board Policy 6121 by disclosing to Dr. Ring that plaintiff was the individual who had complained about his comments.   (Pl's Opp. at 14–15.)   Policy 6121 states that, "to the extent possible . . . all complaints will be treated as confidentially and privately as possible."  (Policy 6121, Ex. H to Ali Aff., ECF No. 78-5.)   Policy 6121 also notes, however, that "disclosure may be necessary to complete a thorough investigation of the charges, and any disclosure will be provided on a 'need to know' basis."  (Id.)  Plaintiff has failed to show that this policy was violated as she does not identify what specific disclosure to Dr. Ring violated this policy.   Moreover, even assuming arguendo that this policy was somehow violated, such a violation cannot be considered materially adverse to plaintiff.   The District's investigation ultimately (and correctly) determined that Dr. Ring's conduct did not rise to the level of a hostile work environment.   Nevertheless, the District directed Dr. Ring to apologize to plaintiff. Obviously, at that point, Dr. Ring had to be informed of the identity of the complainant.

Second, plaintiff complains that she did not receive her new contract until a day before its effective date.  (Pl's Opp. at 17.)   Plaintiff fails, however, to explain how this could possibly be

adverse, since she did not receive and sign her 2009 contract until September 21, 2009, nearly three months after its effective date.  (See 2009 Contract.)  Without more, no reasonable jury could find that the timing of plaintiff's 2010 contract was adverse.

Third, plaintiff claims that she "did not have any face to face conversations" with Dr. Ring after June 2, 2010.  (Pl's Opp. at 18.)  There is limited evidence in the record concerning this allegation.  After July 1, 2010, plaintiff only worked 11 days before resigning and, when she was at work, she reported to Wilson, rather than directly to Dr. Ring.  Accordingly, plaintiff's limited interactions with Dr. Ring were not surprising and certainly not materially adverse.  The record is also clear that plaintiff shared a "very close relationship" with Dr. D'Ambrosio and did not have such a relationship with Dr. Ring.  That, however, does not indicate that a materially adverse action occurred.

Fourth, plaintiff claims that the fact that she was asked to communicate with Gilbert concerning trash left behind by a summer camp was an adverse action.  (Pl's Opp. at 18.)  The work that plaintiff was asked to do does not appear to be out of the ordinary for an administrator— she was asked to coordinate with others to ensure that the task was accomplished, not to pick up trash herself.  This was not materially adverse.

Fifth, plaintiff claims that no one at the District made any "follow-up inquiries" with her in order to "ensure that harassment has not resumed and that all those involved in the investigation of the sexual harassment complaint have not suffered retaliation," as required by Policy 6121.  (Pl's Opp. at 16, 19; Policy 6121.)  The record appears to support plaintiff's claim that defendants did not follow up with her.  Plaintiff worked for only 11 days after July 1, 2010, however, and defendants had extremely limited opportunity to follow up, especially since plaintiff appears to have made no complaints of retaliation prior to her resignation.  To the extent that any violation

29

of Policy 6121 may have occurred, such a violation was not materially adverse.

Sixth, plaintiff also argues that defendants failed to follow up on the claims of retaliation in her resignation letter. (Pl's Opp. at 16.)  The record makes clear, however, that plaintiff's resignation was intended to be final and effective immediately.  Indeed, plaintiff informed other employees that she was resigning before talking to Wilson, turned in her keys while meeting with Wilson, and asked Wilson to wait until she had left the building before informing Ring.  (Minutes of Aug. 26, 2010 Meeting.)  No reasonable jury could find that any such failure was adverse to plaintiff because plaintiff had already resigned.

Seventh, plaintiff was asked to inform the administration, in advance, of the days and hours on which she planned to be in the office.  Although plaintiff fails even to mention this change in her briefs, the Court notes that this new requirement was not adverse to plaintiff because plaintiff testified that the sole purpose of plaintiff's "flex" hours was to benefit students, not herself.  Further, plaintiff testified that she would not have been prevented from structuring her schedule as needed to suit her personal life.  (Alter Aff. 254:2–10.)

The allegations outlined above are, at most, "'trivial harms'—i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience.'" Tepperwien, 663 F.3d at 568 (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68).  Thus, no reasonable jury could find that these minor incidents were materially adverse so as to support a prima facie case of retaliation.  Even when these additional allegations are viewed in conjunction with plaintiff's diminished responsibilities, no reasonable jury could conclude that, in the aggregate, plaintiff was subjected to materially adverse acts.

### 3. Plaintiff Fails to Establish Constructive Discharge

Plaintiff also appears to argue that, in retaliation for her complaint against Dr. Ring, defendants constructively discharged her by reducing her job responsibilities and taking other actions against her. Just as no reasonable jury could find that the defendants took any materially adverse employment actions against plaintiff, no reasonable jury could find that plaintiff was constructively discharged.

In order to establish a claim for constructive discharge, "a plaintiff must show that the employer 'intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily.'" Miller v. Praxair, Inc., 408 F. App'x 408, 410 (2d Cir. 2010) (quoting Terry v. Ashcroft, 336 F.3d 128, 151–52 (2d Cir. 2003)). The Supreme Court has held that the "inquiry is objective" and, therefore, focuses on whether working conditions were, in fact, "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Penn. St. Police v. Suders, 542 U.S. 129, 141 (2004).

A claim of constructive discharge "requires a 'further showing' beyond what is necessary to establish a . . . retaliation claim, such that resignation qualified as a fitting response." Bundschuh v. Inn on the Lake Hudson Hotels, LLC, 914 F. Supp. 2d 395, 408 (W.D.N.Y. 2012) (quoting Suders, 542 U.S. at 124). Thus, where an employee fails to establish that alleged changes to her work responsibilities were materially adverse, those changes cannot support a finding of constructive discharge. See Onofre Polanco v. 34th St. P'ship, Inc., 724 F. Supp. 2d 420, 428 (S.D.N.Y. 2010) ("Given [that]' . . . the changes in [plaintiff's] work responsibilities do not constitute materially adverse change, the Court finds that [plaintiff] was not constructively discharged."); see also Henry v. Abbott Labs., 651 F. App'x 494, 507 (6th Cir. 2016) ("Although [plaintiff] provided enough evidence to establish a materially adverse action for her retaliation

claim, she has not met the burden necessary to show a constructive discharge.")

As described in detail above, no reasonable jury could find either that the changes to plaintiff's work environment rose to the level of material adversity.  As a constructive discharge claim is subject to an even higher standard than either of these claims, it follows that no reasonable jury could find that plaintiff was constructively discharged.

No reasonable jury could find either that plaintiff was subject to a materially adverse action or that she was constructively discharged.  Defendants' motion for summary judgment on plaintiff's retaliation claims is therefore granted and plaintiff's motion for summary judgment is denied.

**D.  Claims of Disability Discrimination**

Plaintiff's Fifth and Sixth Causes of Action are for disability discrimination under the ADA and under the NYHRL, respectively.  Disability discrimination claims can be based either on an alleged failure to accommodate or on an adverse action.

In order to state a claim for failure to accommodate, a plaintiff must allege that "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006).  In order to state a claim based on an adverse action, a plaintiff must allege that (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of disability or perceived disability."  Capobianco v. City of N.Y., 422 F.3d 47, 56 (2d Cir.

2005).

Plaintiff argues that she was diagnosed with clinical depression and anxiety that "substantially limited her ability to eat, sleep, work, and to function in general." (Pl's Opp. at 29.) The parties dispute whether plaintiff, in fact, had such a disability and received such a diagnosis prior to her resignation. Defendants also dispute whether any such impairments substantially limited a major life activity.

These disputes are ultimately irrelevant, however, because plaintiff has failed to provide any evidence that defendants had notice of her alleged disability prior to her resignation. Plaintiff's entire argument that defendants had such knowledge prior to her resignation appears to be premised on the utterly unsupported assertion that her disability was obviously "noticeable" to co-workers. No reasonable jury could conclude that defendants were aware of plaintiff's purported disability or regarded her as having a disability. Absent notice, plaintiff cannot show any causal connection between her alleged disability and the purportedly adverse actions taken against her. The Court also notes that none of the actions taken against plaintiff rise to the level of adverse actions. And, as explained earlier, plaintiff does not have a viable constructive discharge claim.

Finally, to the extent that plaintiff might be alleging that defendants failed to accommodate her disability, that claim fails because not only were the defendants unaware of any disability prior to plaintiff's resignation, but plaintiff has not identified what reasonable accommodation the defendants failed to provide. Plaintiff's disability discrimination claims under the ADA and the NYHRL are utterly meritless.

**E. FMLA Claim**

Plaintiff's Seventh Cause of Action is for violation of the FMLA. The FMLA was enacted, in part, because of Congress's view that "there is inadequate job security for employees who have

serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(a)(4).  "In an effort to enable an employee 'to take reasonable leave for medical reasons,' . . . Congress enacted substantive provisions entitling eligible employees to temporary leave, to certain continuing benefits, and to reinstatement, . . . and made it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under'" the FMLA.  Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160–61 (2d Cir. 1999) (quoting 29 U.S.C. §§ 2601(b)(2); 2615(a)(1)).

Under the FMLA, an employee is entitled to take leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D); see also Pollard v. N.Y. Methodist Hosp., 134 F. Supp. 3d 681, 689 (E.D.N.Y. 2015).  The FMLA defines "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11)(A)–(B).

In order "to prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA."  Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016).  It is undisputed that plaintiff did not give notice of her intention to take FMLA leave and, in fact, never attempted to do so.  Thus, no reasonable jury could find that plaintiff has established the elements of an FMLA interference claim.

Plaintiff, however, argues that defendants violated the FMLA because, according to

plaintiff, the District failed to advise plaintiff of her rights under the FMLA after it received her resignation letter.  (Pl. Opp. at 32.)  The Court thus interprets plaintiff's complaint as advancing a claim based on failure to inform her of her FMLA rights.

In order to establish such a claim, plaintiff "must show that [her employer's] failure to give her the required notification caused her injury."  Gilmore v. Univ. of Rochester, 654 F. Supp. 2d 141, 147 (W.D.N.Y. 2009) (citing Capilli v. Whitesell Const. Co., 271 Fed. App'x. 261, 267 (3d Cir. 2008)); see also De Oliveira v. Cairo-Durham Cent. Sch. Dist., 634 F. App'x 320, 322 (2d Cir. 2016) (noting that the relevant inquiry is "whether the notice violation 'constitute[d] an interference with, restraint, or denial of the exercise of [plaintiff's] FMLA rights'") (quoting 29 C.F.R. § 825.300(e)).

As an initial matter, the Second Circuit has recognized that the FMLA "provides only for the posting of summary notices" of FMLA rights.  Sarno, 183 F.3d at 161 (2d Cir. 1999) (citing 29 U.S.C. § 2619(a)).  Thus, even if the District did not provide plaintiff with individualized notice of her FMLA rights after she submitted her resignation, that is unlikely to constitute a violation of the FMLA.  Plaintiff has failed to provide any evidence that defendants violated the FMLA's summary notice requirements.

Moreover, even assuming that defendants did not notify plaintiff of the existence of the FMLA and that such failure constituted a notice violation, no reasonable jury could find that such violation caused any injury to plaintiff.

First and foremost, plaintiff claims that defendants should have notified her of her FMLA rights after receiving plaintiff's letter of resignation.  (Pl's Opp. at 32–33.)  This is absurd.  By this time, plaintiff had already resigned.  No reasonable jury could find that plaintiff was injured by an alleged failure to provide notice that occurred after her resignation.

Second, the record establishes that plaintiff was well aware of the protections afforded her by the FMLA prior to resigning.  Indeed, one of the formal duties listed in both plaintiff's 2009 and 2010 contracts was to "be responsible for issues related to . . . the Family Medical Leave Act for non-instructional personnel."  (2009 Contract ¶ 2(a)(x); 2010 Contract ¶ 2(a)(ix).)  Further, plaintiff actually requested and took FMLA leave at least once previously.  No reasonable jury could find that plaintiff was injured by an alleged failure to provide of the FMLA notice because plaintiff was already well aware of the FMLA.

Defendants' motion for summary judgment on plaintiff's FMLA claim is therefore granted and plaintiff's motion for summary judgment is denied.

## F.  Section 1983 Violation

Plaintiff brings her Eighth Cause of Action under 42 U.S.C. § 1983, arguing both that her First Amendment right to free speech was violated and that she was deprived of her interests associated with her employment without due process of law.  "To prevail on a § 1983 claim, a plaintiff must prove that the challenged conduct was attributable at least in part to a person acting under color of state law, and that the conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States."  Wimmer v. Suffolk Cty. Police Dep't, 176 F.3d 125, 136–37 (2d Cir. 1999) (citing Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993))

As an initial matter, plaintiff makes no mention of any violation of her First Amendment rights in her briefs, and the record includes no evidence suggesting that any such violation occurred. The Court thus construes plaintiff as having abandoned that claim and, in any event, finds that no reasonable jury could find that any such First Amendment violation occurred.

Plaintiff also fails to advance a cognizable argument in support of the claim that she was

deprived of any property interest without due process. She merely argues that she had a property interest in her employment and benefits—which is undisputed—before moving on to a description of the District's sexual harassment policy.[7] Insofar as plaintiff advances any argument in support of her claim, that argument appears to be that she was constructively discharged. For the reasons above, no reasonable jury could find that plaintiff was constructively discharged.

Indeed, the Second Circuit has held that, where § 1983 claims are premised on an "employer's failure to afford the employee legally required procedural protections, and the employee voluntarily resigns before being discharged, the resignation effectively deprives the employer of the opportunity to comply with the procedural obligations and forecloses the employee from seek[ing] the protections of her previous rights as an employee." Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996) (internal quotations omitted).

The record here is insufficient to establish constructive discharge, and plaintiff fails to advance any other cognizable argument in support of her § 1983 claim. As such, no reasonable jury could find that the defendants deprived plaintiff of any constitutional right. Defendants' motion for summary judgment on plaintiff's § 1983 claim is granted, and plaintiff's motion for summary judgment is denied.

---

[7] Plaintiff cites the District's policy prohibiting sexual harassment and argues that defendants are in violation of that policy in an apparent attempt to impose municipal liability on the District. (Pl's Opp. 26–28.) Because the Court finds that no violation of § 1983 occurred, it does not reach the question of municipal liability. The Court notes, however, that plaintiff's argument appears to rest on a fundamental misunderstanding of the Supreme Court's holding in Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978). The existence of a municipal policy *prohibiting* behavior that might result in a constitutional violation cannot be the basis for municipal liability. Rather, under Monell, a plaintiff seeking to impose liability on a municipality "must prove that a municipal 'policy' or 'custom' *caused* the deprivation." Wimmer, 176 F.3d 125, 137 (2d Cir. 1999) (emphasis added) (citing Board of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 403 (1997)).

### III.    CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.  The Clerk of Court is directed to enter judgment accordingly and close the case.

**SO ORDERED.**

Date: January 12, 2017
Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge